**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America | No. CV12-0105-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| $2,164,341 in US Currency | |
| Defendant. | |

The government has filed a motion for summary judgment on its forfeiture claim regarding $2,164,341 seized from Claimant Leonardo Cornejo-Reynoso ("Claimant"). Doc. 42.  The motion is fully briefed.  Docs. 45, 46, 47, 48.  For the reasons set forth below, the Court will grant the government's motion.[1]

**I.    Evidentiary Rulings.**

The parties have raised various evidentiary objections.  The Court will address these issues before considering the merits of the parties' arguments.

   **A.    The Government's Evidence.**

In support of its motions, the government cites the verified complaint (Doc. 1) and the following exhibits:  (1) the affidavit of Drug Enforcement Administration ("DEA") Special Agent Christopher Salyer ("Agent Salyer") (Doc. 42-2); (2) the affidavit of Javier

---

[1] Claimant's request for oral argument is denied.  The parties' briefing and other submissions have amply addressed the issues raised by the motions, and the Court finds that oral argument will not aid its decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

1     Granda (Doc. 42-3); (3) Claimant's 2010 bankruptcy schedules (Doc. 42-3); (4) the

2     affidavit of Arizona Department of Public Safety ("DPS") Canine Officer Anthony

3     Gerard ("Officer Gerard") (Doc. 42-5); and (5) a memorandum written by Claimant, on

4     Super Discount Bodega letterhead, to the U.S. Department of Homeland Security, U.S.

5     Citizenship and Immigration Services ("USCIS"), Director David L. Roark, Texas

6     Service Center, (Doc. 50).[2]  Claimant makes numerous objections to the government's

7     evidence.

8           "A trial court can only consider admissible evidence in ruling on a motion for

9     summary judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

10    The evidence may be submitted in an affidavit, which would not itself be admissible at

11    trial, but the affidavit or the party presenting it must demonstrate that the affiant could

12    present the evidence in admissible form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032,

13    1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the

14    admissibility of the evidence's form.   We instead focus on the admissibility of its

15    contents.").  Thus, "[a]n affidavit or declaration used to support or oppose a motion [for

16    summary judgment] must be made on personal knowledge, set out facts that would be

17    admissible in evidence, and show that the affiant is competent to testify on the matters

18    stated." Fed. R. Civ. P. 56(c)(4).  Federal Rule of Evidence 602 prohibits a witness from

19    testifying on a matter "unless evidence is introduced sufficient to support a finding that

20    the witness has personal knowledge of the matter."   Thus, an affidavit can support

21             [2]  Claimant did not have an opportunity to object to the admissibility of the

22    memorandum because the government filed it after having submitted its reply brief.  If
Claimant were to object on authentication grounds, Claimant's signature on the

23    memorandum (Doc. 50 at 4) matches his signature verifying the answer in this case
(Doc. 7 at 16), a fact sufficient to satisfy the authentication requirement of Federal Rule

24    of Evidence 901(b)(3).  The memorandum may also be authenticated because Claimant
produced the document in discovery.  Doc. 49 at 2; *see Metro-Goldwyn-Mayer Studios,*

25    *Inc. v. Grokster, Ltd.*, 44 F. Supp. 2d 966, 972 (C.D. Cal. 2006) (noting that the
authentication requirement can be satisfied where the document was produced in

26    discovery and offered into evidence by the non-producing party).  If Claimant were to
object on hearsay grounds, that same signature is sufficient to establish the admissibility

27    of the letter as an opposing party's statement under Rule 801(d)(2).  *See United States v.*
*Moran*, 759 F.2d 777, 785-86 (9th Cir. 1985) (letters and deposit slips signed by

28    defendant admissible as statement by party opponent).

summary judgment only if it sets forth facts personally known to the witness.

Claimant argues that the Court cannot rely on the verified complaint because Agent Salyer's verification does not satisfy Rule 56(c)(4). "A verified complaint may be treated as an affidavit to the extent that the complaint is based on personal knowledge and sets forth facts admissible in evidence and to which the affiant is competent to testify." *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985); *see also Johnson v. Meltzer*, 134 F.3d 1393, 1400 (9th Cir. 1998). Agent Salyer's verification states "that the matters contained in the Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief as to those matters, I believe them to be true. The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as our investigation of this case, together with others, as a Special Agent with the [DEA]." Doc. 1-1 at 1. The complaint, however, never identifies which allegations are based on Agent Salyer's personal knowledge and which he simply believes to be true. As a result, the government cannot rely on the verified complaint to support its motion. Affidavits based merely on information and belief do not satisfy the requirements of Rule 56. *See Harris v. Gonzales*, 488 F.3d 442, 446 (D.C. Cir. 2007). The Court accordingly has relied only on those assertions in the complaint that are admitted by Claimant.

Claimant argues that the Court should disregard the affidavits of Agent Salyer, Javier Granda, and Officer Gerard because the government failed to satisfy its disclosure obligations with respect to these affiants, and because the affidavits fail to show personal knowledge and contain inadmissible hearsay. Claimant's disclosure objection is not well taken. Forfeiture actions are exempt from Rule 26(a)(1)(A)'s initial disclosure requirements. *See* Fed. R. Civ. P. 26(a)(1)(B)(ii). In response to Claimant's personal knowledge and hearsay objections, the government argues that "[e]vidence required to prove their individual personal knowledge can be provided by the witness's own testimony." Doc. 48 at 8. This argument misunderstands the requirements of Rule 56.

1    The affidavit itself must "show that the affiant is competent to testify on the matters
2    stated." Fed. R. Civ. P. 56(c)(4).  The affidavit of Agent Salyer does not state that it is
3    made in its entirety on the basis of personal knowledge, but it does identify some facts
4    that are within his personal knowledge.  Doc. 42-2.  The Court will consider only those
5    portions of the Salyer affidavit that clearly reflect his personal knowledge.  The affidavit
6    of Javier Granda does not show that statements connecting Claimant to a drug cartel are
7    based on personal knowledge.  With the exception of Officer Gerard's description of DPS
8    Sergeant Livingston's interview of Claimant (Doc. 42-5, ¶¶ 62-66) – facts admitted in
9    Claimant's answer (Doc. 7, ¶¶ 94-98) – Officer Gerard's affidavit sets forth facts arising
10   from his personal involvement and therefore satisfies the personal knowledge
11   requirement.  The Court accordingly will consider the Gerard affidavit, the portions of
12   the Salyer affidavit that reflect personal knowledge, and no portion of the Granda
13   affidavit.

14        Attached to Agent Salyer's affidavit is a copy of a traffic citation showing that
15   Claimant committed a traffic violation while operating a BMW X5 in Atlanta, Georgia,
16   on March 8, 2011 (Doc. 42-2 at 27), which was found in Claimant's wallet at the time of
17   the seizure (*id.*, ¶ 50).  Claimant does not object to this document.  *See* Doc. 45-1, ¶ 106.

18        Also attached to Agent Salyer's affidavit is a money ledger.  Doc. 42-2 at 29-30.
19   Claimant objects to this document because "there is no indication that [it] is a true and
20   correct copy of the file purportedly obtained from the laptop and no certified translation
21   of that purported file."  Doc. 45-1, ¶¶ 79-90.  The Court does not agree.  Officer Gerard
22   confirms that a Dell laptop computer was found in the passenger compartment of the
23   rental truck when Claimant was stopped.  Doc. 42-5, ¶ 61.  Agent Salyer states that he
24   and other investigators obtained a search warrant for the laptop, and that the ledger was
25   found on the laptop.  Doc. 42-2, ¶¶ 40-49.  Claimant does not dispute that a search
26   warrant for the laptop was obtained, but argues without explanation that the issuing court
27   lacked jurisdiction.  Doc. 45-1, ¶ 78.  The government attached a certified translation of
28   the money ledger to its reply brief.  Doc. 48-1 at 6-7.  This certification confirms that the

translation is accurate.  Accordingly, the Court will deny Claimant's lack of foundation objection and will consider the ledger.[3]

Claimant objects to certain bankruptcy records (Doc. 42-4) for lack of certification (*see, e.g.*, Doc. 45-1, ¶ 57), but does not explain the objection.  To the extent Claimant is objecting that the records have not been shown to be records of the Georgia bankruptcy court, this Court can take judicial notice of the fact that the records are found in the docket of the federal bankruptcy court in Georgia.  Fed. R. Evid. 201; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (court may take judicial notice of matters of public record) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)); *but see Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 639 (9th Cir. 2002) (district court did not abuse its discretion in refusing to take judicial notice of bankruptcy proceedings given that the submitted documents were not authenticated).  To the extent Claimant is objecting that the records have not been shown to be his, Claimant's signature on the bankruptcy records (Doc. 42-4 at 12) matches his signature verifying the answer in this case (Doc. 7 at 16), a fact sufficient to satisfy the authentication requirements of Rule 901(b)(3).

### B.    Claimant's Evidence.

During the course of this litigation, the government repeatedly arranged for Claimant to enter the United States from Mexico in order to be deposed.  The Court also

---

[3] Claimant does not make a hearsay objection to the ledger, but such an objection would not be well taken because the ledger is likely admissible under Federal Rule of Evidence 801(d)(2).  *See United States v. Gil*, 58 F.3d 1414, 1419-21 (9th Cir. 1995) (drug ledgers admissible because handwriting expert's testimony and circumstantial evidence established sufficient foundation for jury to find that defendant made, authorized, or adopted ledgers); *see also United States v. Carrillo*, 16 F.3d 1046, 1048-49 (9th Cir. 1994) (tally sheet admissible as adopted admission because "there was evidence of adoption that went beyond mere possession.  The figures written on the paper coincided with [defendant]'s negotiations.  There is a sufficient link between the writing and [defendant]'s actions to permit the district court to find an adoption[.]").  The ledger was contained on a laptop in Defendant's possession and in the same truck with the $2,164,341 in seized cash.  The ledger shows receipts totaling $2,180,924.00 (Doc. 48-1 at 6), an amount that varies from the cash found in the truck by less than 1%.  These facts provide sufficient circumstantial evidence for the ledger to be admissible as an adoptive admission.

- 5 -

1    extended the discovery schedule to afford Claimant an opportunity to appear.  Claimant
2    repeatedly refused to appear, asserting that he was not willing to enter the United States
3    and risk of being arrested and prosecuted for charges pending against him in an Arizona
4    state court.  As a result, the Court entered an order preventing Claimant from testifying or
5    submitting an affidavit in this case.  *See* Doc. 41.  As a result, Claimant is required to rely
6    on other sources of evidence to oppose the government's motion for summary judgment.

7          Claimant has produced (1) an affidavit of Antonio Briseño Herrera (Doc. 45-2),
8    (2) real estate and tax records relating to a 2004 transaction (Docs. 45-3, 45-4, 45-5),
9    (3) documents relating to Claimant's USCIS investor visa application (Docs. 45-6, 45-7,
10   45-8), and (4) documents relating to an Arizona State criminal matter which was
11   dismissed without prejudice against Javier Granda (Docs. 45-9, 45-10, 45-11).   The
12   government objects to the Herrera affidavit and urges the Court to strike it because
13   Claimant did not produce the affidavit in response to the government's Rule 33, 34, and
14   36 discovery requests.  Doc. 48 at 1-2.  The affidavit is dated March 25, 2013, only two
15   days before it was filed in this case.  The government has not shown that the affidavit
16   existed earlier and therefore should have been disclosed pursuant to a document
17   production request.  To the extent the government is complaining that Herrera was not
18   disclosed as a witness, the Court has already noted that this case is exempt from the
19   Rule 26(a)(1) disclosure requirements.   Moreover, the government itself relies on
20   Herrera's email and phone conversations (Doc. 42-2, ¶¶ 54, 57-60) and thus was aware of
21   Herrera's identity prior to Claimant's submission of the affidavit.  The government has
22   not shown that it was prejudiced by Claimant's failure to disclose.  The Court overrules
23   this objection.

24         The government objects to the documents relating to the real estate transaction
25   because they are "remote in time, contain nothing of significance regarding the source of
26   the specific funds seized, are irrelevant, and fail to raise a material issue of fact."  Doc. 48
27   at 2.  Additionally, the government contends that Claimant "can never lay the proper
28   foundation for the introduction of this evidence."  *Id.*  The real estate transaction

documents include (1) a 2004 California Real Estate Withholding Tax Statement, Form 593-B (Doc. 45-3); (2) a settlement document reflecting closing costs for a 2004 real estate transaction (Doc. 45-4); and (3) a 2004 interest income statement, Form 1099-INT, reflecting proceeds from a real estate transaction (Doc. 45-5).  Claimant has not provided an affidavit or other evidence establishing how the real estate documents would be admissible at trial in light of the authentication rules.  *See* Fed. R. Evid. 901, 902.  "[U]nauthenticated documents cannot be considered in a motion for summary judgment[,]" *Orr*, 285 F.3d at 773, and Claimant has not submitted "evidence sufficient to support a finding that [the real estate transaction documents are] what [Claimant] claims[,]" Fed. R. Evid. 901(a).  Without a certification satisfying Rule 902(4), the unsigned and unsealed public documents are not self-authenticating under Rule 902.  The Court notes that Claimant's memorandum to USCIS (Doc. 50), a document filed by the government, supports the fact that Claimant sold an apartment complex in Chula Vista, California in 2004 for approximately $2.8 million – the fact Claimant attempts to support with the real estate documents.  The Court will consider the two tax documents submitted by Claimant, because they provide support for the same real estate transaction and presumably could be authenticated without testimony from Claimant.  The Court will not consider the settlement statement because Claimant has provided no evidence to show that it was in fact generated as part of the real estate closing or that it exists in a form that could be authenticated by someone other than Claimant (who cannot testify in this case).

As to the USCIS documents (Docs. 45-6, 45-7, 45-8), the government objects to them on relevance grounds and for lack of foundation.  Doc. 48 at 2-3.  The Court denies the objection because the government relies on a similar USCIS document.  Doc. 49 at 2.  The Court also can take judicial notice of such public records.  Fed. R. Evid. 201.

## II.  Background Facts.

The Court has compiled the following factual summary from allegations of the complaint admitted in Claimant's answer and portions of the affidavits of Officers Gerard and Slayer that meet the requirements of Rule 56(c)(4).

1    In April of 2011, Claimant drove a Budget rental truck on a one-way trip from

2    Atlanta, Georgia, to Los Angeles, California.  Doc. 42-5, ¶¶ 1, 8.  At approximately 5:00

3    a.m. on April 21, 2011, near Flagstaff, Arizona, a city about 700 miles from Los Angeles,

4    Officer Gerard stopped Claimant for an unsafe lane change.  Doc. 1, ¶¶ 21-22, 27, 103;

5    Doc. 7, ¶¶ 21-22, 27, 103.  Claimant produced a Georgia driver's license bearing the

6    name Leonardo Cornejo-Reynoso (Doc. 1, ¶¶ 24-25; Doc. 7, ¶¶ 24-25) and a copy of a

7    Budget rental agreement which reflected a one-way rental from Atlanta to Los Angeles

8    (Doc. 1, ¶ 26; Doc. 7, ¶ 26).  Claimant's arm was shaking during this initial encounter.

9    Doc. 42-5, ¶ 7.

10    Officer Gerard explained the reason for the stop and asked Claimant to step out of

11    the truck while he went back to his patrol car to prepare a warning citation.  Doc. 1,

12    ¶¶ 27, 29; Doc. 7, ¶¶ 27, 29.  Claimant did not want to leave the truck.  Doc. 1, ¶ 32;

13    Doc. 7, ¶ 32.  Officer Gerard asked Claimant where he was going, and Claimant stated

14    that he was going to Los Angeles to donate used clothing and to purchase new clothing

15    for his Atlanta-area clothing store.  Doc. 1, ¶¶ 29-30, 33, 35; Doc. 7, ¶¶ 29-30, 33, 35.

16    Claimant stated that the rental truck contained used clothing.  Doc. 42-5, ¶ 18.  Officer

17    Gerard noted that Claimant understood questions asked in English, but responded in

18    Spanish.  Doc. 42-5, ¶ 17.  Officer Gerard asked Claimant why he did not donate the

19    clothing in Georgia, and Claimant explained that he would receive a discount on the new

20    clothing in exchange for his donation.  Doc. 42-5, ¶ 19.  DPS Sergeant J. Hutton, who

21    was assisting Officer Gerard, asked Claimant about the one-way rental, and Claimant

22    explained that he planned to fly back to Atlanta and have the new clothing shipped there.

23    Doc. 1, ¶ 39; Doc. 7, ¶ 39.

24    Claimant was shaking when Officer Gerard explained the written warning to him.

25    Doc. 1, ¶ 42-43; Doc. 7, ¶ 42-43; Doc. 42-5, ¶ 25.  Officer Gerard advised Claimant that

26    the traffic stop was finished, but told Claimant that he wanted to speak with him further.

27    Doc. 1, ¶ 44; Doc. 7, ¶ 44.  Claimant agreed, and asked Officer Gerard to speak to him in

28    Spanish.  Doc. 1, ¶ 44-45; Doc. 7, ¶ 44-45; Doc. 42-5, ¶¶ 26-27.  Officer Gerard asked

- 8 -

Claimant in Spanish if the rental truck contained drugs, weapons, or large amounts of currency. Claimant said it did not. Doc. 1, ¶¶ 45-46; Doc. 7, ¶¶ 45-46; Doc. 42-5, ¶ 29.

At the officer's request, Claimant signed a form consenting to a search of the truck (Doc. 1, ¶ 49; Doc. 7, ¶ 49) and confirmed that he was responsible for the truck's contents (Doc. 1, ¶ 50; Doc. 7, ¶ 50; Doc. 42-5, ¶ 32). After accessing the rear of the truck, Officer Gerard immediately smelled a strong odor of dirty clothing and body odor (Doc. 42-5, ¶ 33), and found garbage bags containing clothing inside (*id.*, ¶ 34). Officer Gerard inspected a small bag near the truck's cab and found that it contained a large bundle of money wrapped in plastic. *Id.*, ¶¶ 34-35. Officer Gerard told Claimant about the money, and Claimant replied that he did not think the money was illegal and that it was his. Doc. 1, ¶ 54; Doc. 7, ¶ 54; Doc. 42-5, ¶ 36. Officer Gerard asked Claimant why he lied about there being no money in the rental truck, and Claimant responded that he had only asked about drugs and guns. Doc. 1, ¶ 55; Doc. 7, ¶ 55. When Officer Gerard asked how much money was in the truck, Claimant said that there was about two million dollars and that he had obtained the money from the sale of an apartment complex in Chula Vista, California. Doc. 1, ¶¶ 56-58, 106; Doc. 7, ¶¶ 56-58, 106; Doc. 42-5, ¶¶ 38-39. Claimant told Officer Gerard that he had the money with him because he planned to purchase property in California. Doc. 1, ¶¶ 68-69; Doc. 7, ¶¶ 68-69.

Officer Gerard asked Claimant for more details about his background and businesses. Doc. 42-5, ¶ 43. Claimant said that he moved to Atlanta from Guadalajara, Mexico, in 1992, and helped open a Catholic school. Doc. 1, ¶ 61(a)-(b); Doc. 7, ¶ 61(a)-(b). From 1996 to 2000, Claimant opened several businesses in Atlanta, including two restaurants and a mini-mall type center. Doc. 1, ¶ 61(d); Doc. 7, ¶ 61(d). After selling his businesses for $250,000 in 2000, Claimant returned to Guadalajara. Doc. 1, ¶ 61(e); Doc. 7, ¶ 61(e). Claimant said he returned to Atlanta in 2003, at which time he sold the California apartment complex for 2.8 million dollars. Doc. 1, ¶ 61(e)-(f); Doc. 7, ¶ 61(e)-(f). When asked what he did before owning the apartment complex, Claimant stated that he imported stationery products. Doc. 1, ¶ 62; Doc. 7, ¶ 62.

After closing and securing the rear door of the rental truck, Officer Gerard advised Claimant that he was not under arrest, that he was under investigative detention, and that DPS would transport the truck to one of its facilities for a more extensive search.  Doc. 1, ¶ 66; Doc. 7, ¶ 66; Doc. 42-5, ¶¶ 47-48.

At the DPS facility, Officer Gerard used certified narcotic detention canine "Crowe" to examine the rental truck.  Doc. 42-5, ¶ 54.  Crowe positively alerted to the rear of the rental truck and to boxes containing the money discovered in the truck.  Doc. 42-5, ¶¶ 54-59.  Officers inventoried the rental truck's contents and found more money concealed inside the bags of used clothing, bound by rubber bands and wrapped in plastic containing axle grease.  Doc. 1, ¶¶ 76, 107; Doc. 7, ¶¶ 76, 107.  A total of $2,164,431.00 in cash was found inside the truck.  Doc. 42-1, ¶ 76; Doc. 45-1, ¶ 76.

A laptop computer was found in the passenger compartment of the truck.  When searched pursuant to a warrant, the laptop was found to contain a ledger that reflects receipts of more than $2 million during the month of March 2011.  Doc. 42-2, ¶¶ 40-49.

After being advised of his rights and demonstrating that he understood his rights, DPS Sergeant Livingston, who speaks fluent Spanish, interviewed Claimant.  Doc. 1, ¶ 94; Doc. 7, ¶ 94.  Claimant said that he was from Guadalajara and that he was in the United States on an investor visa, which he had used to open several businesses in Georgia.  Doc. 1, ¶¶ 95-96; Doc. 7, ¶¶ 95-96.  Claimant told Officer Livingston that he did not receive a salary from the businesses because he took money from the businesses whenever he needed it.  Doc. 1, ¶ 97; Doc. 7, ¶ 97.  Claimant could not remember his current address because he had not lived there long, but knew that it was in Snellville, Georgia, and that his previous address was 2520 Sugarloaf Club Drive, Duluth, Georgia.  Doc. 1, ¶ 98; Doc. 7, ¶ 98.

Sometime after the seizure of the money found in the truck, Claimant returned to Guadalajara.  Doc. 1, ¶ 109; Doc. 7, ¶ 109.  Claimant remains in Mexico.  Doc. 1, ¶ 123.

///

///

1    **III.    Legal Standards.**

2          **A.    Summary Judgment.**

3          A party seeking summary judgment "bears the initial responsibility of informing

4    the district court of the basis for its motion, and identifying those portions of [the record]

5    which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

6    *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

7    evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

8    no genuine dispute as to any material fact and the movant is entitled to judgment as a

9    matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a

10   party who "fails to make a showing sufficient to establish the existence of an element

11   essential to that party's case, and on which that party will bear the burden of proof at

12   trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome

13   of the suit will preclude the entry of summary judgment – the disputed evidence must be

14   "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16         **B.    Civil Forfeiture Standards.**

17         "Summary judgment procedures must necessarily be construed in light of the

18   statutory law of forfeitures, and particularly the procedural requirements set forth

19   therein." *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 979 (9th Cir. 2002).

20         **1.    The Government's Burden of Proof.**

21         Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), "the burden of

22   proof is on the Government to establish, by a preponderance of the evidence, that the

23   property is subject to forfeiture[.]"    18 U.S.C. § 983(c)(1); *see United States v.*

24   *$80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002) ("CAFRA transferred

25   the burden of proof from the Claimants to the government and required the government

26   to establish forfeiture by a preponderance of the evidence rather than by the lower

27   probable cause standard[.]").  "[I]f the Government's theory of forfeiture is that the

28   property was used to commit or facilitate the commission of a criminal offense, or was

1    involved in the commission of a criminal offense, the Government shall establish that
2    there was a substantial connection between the property and the offense."  18 U.S.C.
3    § 983(c)(3).

4              **2.        Claimant's Burden of Proof.**

5              If the government meets its burden of proof regarding forfeiture, the burden shifts
6    to the Claimants to prove, by a preponderance of the evidence, that the currency was not
7    connected with illegal activity.  *Currency, U.S. $42,500.00*, 283 F.3d at 980.  "'A
8    'claimant' is one who claims to own the article or merchandise or to have an interest
9    therein.'"  *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983) (quoting *United*
10   *States v. $15,500.00 in U.S. Currency*, 558 F.2d, 1359, 1360 (9th Cir. 1977), and citing
11   *United States v. One 56-Foot Motor Yacht Named Tahuna*, 702 F.2d 1276, 1279
12   (9th Cir. 1983)).  Possession of currency at the time of seizure, "coupled with a claim of
13   ownership," is sufficient to establish standing to challenge forfeiture at the summary
14   judgment stage.  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 639 (9th Cir.
15   2012).

16             To defeat a civil forfeiture action, a claimant must "show by a preponderance of
17   the evidence that the property was not involved in a violation of the narcotics laws, or []
18   otherwise refute the government's showing[.]"  *United States v. $215,300 in U.S.*
19   *Currency*, 882 F.2d 417, 419 (9th Cir. 1989); *see also One 56-Foot Motor Yacht Named*
20   *Tahuna*, 702 F.2d at 1281 (a claimant may defeat forfeiture in one of two ways, either by
21   refuting the government's evidence, or by producing affirmative evidence that the
22   property seized was not used or intended to be used for illegal purposes).

23             CAFRA also contains an "innocent owner" defense.  *See* 18 U.S.C. § 983(d).
24   Under this defense, the claimant has the burden of showing he is an innocent owner by a
25   preponderance of the evidence.  *Id.*  An "innocent owner" is one who "did not know of
26   the conduct giving rise to forfeiture," or, "upon learning of the conduct giving rise to
27   forfeiture, did all that reasonably could be expected under the circumstances to terminate
28   such use of the property."  *Id.* at § 983(d)(2)(A)(i)-(ii).  *See United States v. 493,850 in*

- 12 -

1     *U.S. Currency*, 518 F.3d 1159, 1170 (9th Cir. 2008) (citing standard).

2     **IV.     The Government's Evidence.**

3          To determine whether the government has met its burden of showing that the

4 seized currency was more likely than not substantially connected to illegal activity, the

5 Court must look to the totality of the circumstances.  *See Currency, U.S. $42,500.00*, 283

6 F.3d at 980 (the determination is based on the aggregate of facts, including circumstantial

7 facts).  The government may include evidence gathered after the filing of the forfeiture

8 complaint.  18 U.S.C. § 983(c)(2).

9          The government attempts to establish a substantial connection between the seized

10 money and three crimes.  First, the government alleges that the money was connected to

11 drug trafficking crimes in violation of Title II of the Controlled Substances Act,

12 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture under § 881(a)(6).  Doc. 1 at 17;

13 Doc. 42 at 10-11.  In civil forfeiture proceeding under this provision, seized money is

14 subject to forfeiture if it was "(1) furnished or intended to be furnished in exchange for a

15 controlled substance; (2) traceable to such an exchange; or (3) used or intended to be

16 used to facilitate a violation of federal drug laws."  *United States v. $191,910.00 in U.S.*

17 *Currency*, 16 F.3d 1051, 1071 (9th Cir. 1994), *superseded on other grounds by statute as*

18 *stated in $80,180.00*, 303 F.3d at 1184.  Second, the government alleges that the currency

19 was connected to the crime of money laundering in violation of 18 U.S.C. §§ 1956-57,

20 and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).  Doc. 1 at 17; Doc. 42 at 10-

21 11.  Third, the government alleges that the currency constitutes proceeds of drug

22 trafficking transported in interstate travel in violation of 18 U.S.C. § 1952, and is subject

23 to forfeiture under 18 U.S.C. § 981(a)(1)(C).  Doc. 1 at 17; Doc. 42 at 10-11.  The

24 government discusses several factors – some based on undisputed facts – that, taken

25 together, allegedly demonstrate a substantial connection between the seized money and

26 these crimes.  Doc. 42 at 11-14.  The Court will address the evidence it has found to

27 satisfy the requirements of Rule 56(c)(4).

28          The government submits that Claimant's rental truck contained $2,164,341 in cash

and that possession of a large amount of cash is strong evidence of a connection to illegal activity.  Doc. 42 at 11; *see United States v. U.S. Currency, $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988) ("[P]ossession of a large amount of cash 'is strong evidence that the money was furnished or intended to be furnished in return for drugs.'" (quoting *United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir. 1984))).  Although not alone sufficient to show a connection to illegal drug transactions, this factor is significant given the large sum of money discovered in this case.  *See $42,500.00*, 283 F.3d at 981 ("A large amount of money standing alone, however, is insufficient to establish probable cause." (citing *$191,910.00*, 16 F.3d at 1072 ("Fifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity. Indeed the amount of money, standing alone, would probably be insufficient to establish probable cause for forfeiture."))); *$93,685.61*, 730 F.2d at 572 ("The money, in combination with other persuasive circumstantial evidence, particularly the presence of the drug paraphernalia, is sufficient here to establish probable cause.").

The government argues that the packaging of the money is also relevant.  Doc. 42 at 12-14.  "[C]ellophane is not a normal repository for carrying large amounts of money. Rather cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs."  *$42,500.00*, 283 F.3d at 982 (citing *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 490 (9th Cir. 1997)). Packaging the $2,164,341 in bundles, banded with rubber bands, wrapped in plastic containing axle grease, is certainly consistent with efforts to block the odor of drugs and to conceal the money with an odor-masking grease.  *See $129,727.00*, 129 F.3d at 490 (linking money wrapped in dryer sheets and plastic wrap with drug activity); *$42,500.00*, 283 F.3d at 982 (finding cellophane wrapping of currency a common way to conceal odor of drugs); *United States v. $80,010.00 in U.S. Currency*, No. SACV-08-5189 DOC (SSx), 2010 WL 580015, *2 (C.D. Cal. Feb. 11, 2010) ("The bundling of bills with rubber bands and embedding of the bills in the lining of a jacket found in luggage in claimant's possession is further evidence that the funds were furnished in return for drugs."); *United*

*States v. $124,700, in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) ("[W]e have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking."). The record lacks "competent evidence suggesting an innocent reason for packaging the currency in this unusual fashion." *$42,500.00*, 283 F.3d at 981-82; *see also United States v. $242,484.00*, 389 F.3d 1149, 1160-61 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities.").

The government contends that the method of concealing the bundled currency is another factor establishing a connection between the currency and drug crimes. Doc. 42 at 12-13. The Court agrees. Although a person carrying a large sum of cash for any reason, including innocent reasons, is likely to conceal the currency from public view, the money in this case was concealed among bundles of unwashed clothing emitting a strong scent of dirty laundry and body odor in the back of a rental truck – not the place where one would innocently conceal valuable property. The method of concealment strongly suggests that the Claimant was attempting to hide the scent of drug-related money from law enforcement.

The government argues that Claimant's disclaimer and false claim of ownership of the currency are relevant factors. Doc. 42 at 15-22. The government argues that the ownership claim is false because Claimant's explanation that he earned the money from the sale of an apartment complex (Doc. 42-5, ¶ 39) does not comport with the reported income and judgments appearing on Claimant's 2010 bankruptcy schedules (Doc. 42-5, ¶¶ 39-46, 49-52; Doc. 42-4 at 1-31). The Court agrees that serious discrepancies in Plaintiff's claim of ownership favor the government's case. Claimant told Officer Gerard that he sold the apartment complex in 2004 (Doc. 42-5, ¶ 43(f)), but his bankruptcy schedule of assets, filed in 2010 under penalty of perjury, fails to list the more than

- 15 -

$2,000,000 in alleged proceeds from the sale (Doc. 42-4).  Claimant's memorandum to USCIS indicates that of the $2.8 million he obtained from the 2004 real estate sale, he invested approximately $1.2 million in a commercial enterprise.   Doc. 50.   These documents also seriously undermine Claimant's assertion that he has been holding the money since 2004 as cash proceeds of an apartment sale.

That assertion is also undermined by the ledger found on Claimant's laptop.  The ledger shows deposits of funds during the month of March 2011 – the month before Claimant was stopped in the rental truck – totaling $2,180,924.00. Doc. 48-1 at 6.  The deposits are made by a variety of individuals and entities.  Although the money in the ledger does not total the $2,164,341 found in the rental truck exactly, the difference is only about $16,000, less than 1%.  The ledger appears to contradict Claimant's assertion that the cash in the truck was produced by an apartment sale seven years earlier.

The government argues that the positive dog alert connects the money to illegal drug activity.  Doc. 42 at 14.  Claimant argues that the alert is "of little probative value" because Crowe initially alerted to the truck itself, and that he has "had no opportunity to conduct discovery regarding [Officer Gerard and Crowe's] background, qualifications and bases for the alerts."  Doc. 45 at 10.  In cases finding that a positive drug sniff is a factor establishing that there is a connection between money and a drug crime, the record has contained evidence regarding the dog's reliability and the methodology of the sniff. *See, e.g.*, *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 455-65 (7th Cir. 2005); *$22,474.00*, 246 F.3d at 1216-17 (finding that a sophisticated dog sniff provided one of the necessary links to illegal drug activity where "the government provided evidence that unless the currency [the claimant] was carrying had recently been in proximity of cocaine, the detention dog would not have alerted to it."); *United States v. $49,790 in U.S. Currency*, 763 F. Supp. 2d 1160, 1162-67 (N.D. Cal. 2010) (finding that the positive alert was by a "sophisticated" dog after considering expert testimony).  The government has presented evidence establishing that "Crowe is certified as a patrol and narcotics detection canine

1    . . . through Adlerhort International of Riverside, California" (Doc. 42-5, ¶ 56), and that

2    "Crowe is a 'sophisticated dog' within the definition of *U.S. v $222,474*, 24 F.2d 1212

3    (9th Cir. 2001)."  Doc. 42-1, ¶ 68.  Claimant argues, incorrectly, that Officer Gerard and

4    Crowe were not properly disclosed under Rule 26(a)(1), but otherwise does not dispute

5    the assertion that Crowe is a sophisticated drug detection dog.  Doc. 43-1, ¶ 68.  The dog

6    alert evidence weighs in favor of the government's case.[4]

7         The Court concludes that the government has met its burden of providing

8    sufficient evidence to conclude, by a preponderance standard, that the money was used or

9    intended to be used to facilitate a violation of federal drug laws.  21 U.S.C. § 881(a)(6);

10   *see also $191,910.00*, 16 F.3d at 1071.  The evidence supporting this conclusion includes

11   the more than two million dollars in cash found in the rental truck, the packaging of the

12   money in cellophane and axle grease to avoid detection of its scent, the concealment of

13   the money in dirty laundry to further avoid detection of its scent, and the sophisticated

14   dog alert to the truck and the money.  In addition, Claimant's bankruptcy records, his

15   memorandum to USCIS, and the ledger on his laptop undermine his claim that he has

16   possessed the currency since a 2004 apartment sale as he suggested to Officer Gerard.

17   Because the government has clearly carried its burden of showing by a preponderance of

18   the evidence that the currency was connected to drug trafficking, the Court must now

19   look to the evidence presented by Claimant.

20         [4] To show Claimant's past drug money laundering activities and associations, the
     government submits the affidavits of Javier Granda and Agent Salyer.  Doc. 42 at 17-19.

21   Granda states that he and Claimant both worked as money launderers for the same
     Mexican drug cartel.  Doc. 42-3, ¶¶ 1, 19-21.  Salyer avers that a DEA investigation

22   connected Claimant to a drug cartel because Claimant owns a BMW SUV and has a
     traffic citation showing that he was speeding in that vehicle in geographical and temporal

23   proximity to a citing of Granda and another alleged cartel member entering a BMW
     SUV.   Doc. 42-2, ¶¶ 20, 50.   Additionally, Salyer summarizes email and phone

24   conversations between Granda and Antonio Briseño Herrera that allegedly include
     references to Claimant and the two million dollars (*id.*, ¶¶ 58-62) and Claimant's

25   telephone contact list that purportedly establishes a relationship with persons affiliated
     with the drug cartel (*id.*, ¶¶ 51-52).  The Court sustained Claimant's Rule 56 objections to

26   this evidence above, and also finds that Claimant has raised a genuine issue of fact by
     pointing to Herrera's affidavit (Doc. 45-2).  The Court will not rely on this disputed

27   evidence as a basis for granting summary judgment.

28

1    **V.    Claimant's Evidence.**

2          Claimant argues that he has submitted evidence establishing a lawful source of the

3    money.  Doc. 45 at 11-12.  At the time of the seizure, Claimant explained that he was

4    carrying about two million dollars, that he had obtained the money from the sale of an

5    apartment complex in Chula Vista, California, and that he transported the money from

6    Atlanta to purchase property in California.   USCIS documents show that Claimant

7    obtained an investor visa based on his investment in domestic commercial enterprises in

8    2007.  Doc. 45-7 at 2.   A document relating to Claimant's investor visa application

9    (Doc. 50), demonstrates that Claimant invested approximately $1,200,000 in commercial

10   enterprises (*id.* at 3).  This document also shows that Claimant obtained approximately

11   $2,800,000 in 2004 from the sale of a property in Chula Vista, California (*id.*), and that

12   he inherited approximately $220,000 after the passing of his father (*id.*).  The affidavit of

13   Antonio Briseño Herrera states that Claimant "has handled money for a long time with

14   legitimate businesses as well as his family members."  Doc. 45-2, ¶ 7.  This evidence

15   suggests that there may be a lawful source of the money.

16         This evidence does not explain, however, why Claimant would be carrying more

17   than $2 million in cash in the back of a rental truck, why it was wrapped in cellophane

18   and axle grease, why it was concealed in dirty laundry, or why it was detected by a

19   sophisticated dog alert.  Nor does it explain the ledger on Claimant's laptop that shows

20   almost the same amount of money coming from various individuals and entities in the

21   weeks before Claimant was stopped near Flagstaff, or why Claimant's bankruptcy

22   schedules did not include the money supposedly produced by a 2004 sale.  Given this

23   unexplained evidence, the Court concludes that no reasonable trier of fact – jury or judge

24   – could find that Claimant was carrying the $2,164,341 in currency for legitimate, non-

25   drug related reasons.  *See Anderson*, 477 U.S. at 258 (to defeat summary judgment, the

26   evidence must be "such that a reasonable jury could return a verdict for the nonmoving

27   party.").

28   ///

- 18 -

**VI.   Conclusion.**

The government has carried its burden of showing by a preponderance of the evidence that there is a substantial connection between the money seized and illegal drug activity.   18 U.S.C. § 983(c)(3).   Claimant has failed to present evidence that raises a genuine issue of material fact for trial.   The government is therefore entitled to summary judgment.

**IT IS ORDERED:**

1.   The government's motion for summary judgment (Doc. 42) is **granted**.   Claimant's interest in $2,164,341 in U.S. Currency is forfeited to the United States.   If the government desires a more formal judgment, it shall submit a form of judgment to the Court.

2.   The government's motion for judgment of forfeiture (Doc. 44) is denied as moot.

3.   The Clerk is directed to terminate this action.

Dated this 6th day of June, 2013.

_____
David G. Campbell
United States District Judge

- 19 -